CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

September 24, 2024

LAURA A. AUSTIN, CLERK
BY: /s/ Kendra Campbell
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

M.B., residing at UNITED
STATES PENITENTIARY, HAZELTON
1640 Sky View Drive
Bruceton Mills, WV 26525,

Case No.  1:24cv40

      *Plaintiff,*

Judge:

v.

UNITED STATES OF AMERICA,

and

J.C. STREEVAL
Former Warden
125 Meadow Court
Johnson City, TN 37615,

and

DR. KAREEM WASIM, PsyD
Chief Psychologist
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. JOSE CAPRILES-MERCADO, PsyD
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. BIANCA BULLOCK, PsyD
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. LAURA BAILEY, PsyD, DAPC
Psychology Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

DR. TIMOTHY YORK, MAT,
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

*Defendants*.

## PLAINTIFF'S COMPLAINT FOR INDIVIDUAL DAMAGES

Plaintiff M.B. ("Plaintiff" or "M.B.")[1], through undersigned counsel, submits this Complaint against Defendants United States of America, J.C. Streeval, Dr. Kareem Wasim, Dr. Jose Capriles-Mercado, Dr. Bianca Bullock, Dr. Laura Bailey, and Dr. Timothy York (collectively "Defendants;" without the United States, "Individual Defendants"). Plaintiff seeks damages for injuries he suffered as a result of Defendants' deliberate indifference toward, and breach of their duties to provide treatment for, M.B.'s medical mental health needs. Plaintiff hereby alleges, based on his personal knowledge, information, and belief, as follows.

---

[1] Plaintiff is separately a member of a putative class of plaintiffs in the related case captioned, *M.L. et al. v. Merrick Garland, et al.*, Case No. 1:24-cv-00017-JPJ-PMS, filed in this Court. In the instant action, Plaintiff is solely seeking individual monetary damages.

2

## NATURE OF THE CASE

1.      "We don't do that psych shit here." –Defendant Dr. Kareem Wasim, Chief Psychologist at United States Penitentiary Lee ("USP Lee").

2.      In various iterations, guards, and staff at USP Lee frequently recite this mantra to residents at USP Lee seeking mental health care.  The deliberate indifference of the staff at USP Lee to the safety and health of its residents and USP Lee staff's breach of its duty to provide adequate care to its residents are not reflected in words alone—it is an institutional directive to ignore the medical needs, particularly mental health needs, of its residents.

3.      The federal Bureau of Prisons ("BOP") generally classifies the following diagnoses as "serious mental illnesses:  schizophrenia spectrum and other psychotic disorders, bipolar and related disorders, and major depressive disorder."[2]  In addition, the following diagnoses are often classified as "serious mental illnesses, especially if the condition is sufficiently severe, persistent, and disabling:  anxiety disorders, obsessive-compulsive and related disorders, trauma and stressor-related disorders, intellectual disabilities and autism spectrum disorders, major neurocognitive disorders, and personality disorders."[3]

4.      A significant number of incarcerated persons suffer from serious mental health conditions and are incarcerated, at least in part, because of their unmet health needs, including untreated mental illnesses and substance use disorders that disproportionately intersect with other physical health conditions.[4]  Proper medical and mental health care while in prison are critical to

---

[2] *Treatment and Care of Inmates With Mental Illness*, Fed. Bureau of Prisons at 1–2 (May 1, 2014), https://www.bop.gov/policy/progstat/5310_16.pdf [hereinafter Program Statement 5310.16].

[3] *Id.* at 1 (noting that residents with illnesses not listed may also be classified as "seriously" mentally ill if their symptoms result in significant functional impairment).

[4] *Incarceration and Health:  A Family Medicine Perspective (Position Paper)*, Am. Acad. of Family Physicians, https://www.aafp.org/about/policies/all/incarceration.html#:~:text=Compared%20to%20 the%20general%20population,hepatitis%20C18%20and%20tuberculosis (last visited Apr. 3, 2024); Alexis Jones & Wendy Sawyer, *Arrest, Release, Repeat:  How police and jails are misused to respond to social problems*, Prison Pol'y Initiative (Aug. 2019), https://www.prisonpolicy.org/reports/repeatarrests.html (last visited Apr. 3, 2024).

ensuring the rehabilitation of individuals and reducing the likelihood of recidivism.  Moreover, adequate medical and mental health treatment of incarcerated individuals not only helps to ensure safety among the prison population, but also contributes to the safety of the general public as incarcerated individuals are released and re-enter society.

5.    Healthcare, including treatment for mental health, is one of the primary responsibilities the BOP assumes for the approximately 158,500[5] people in federal custody.[6] Individuals in the BOP's facilities rely completely on BOP staff and medical professionals for their healthcare needs, including prescriptions and access to their medications, scheduling necessary medical appointments with and referrals to outside providers, and appropriate treatments and examinations by medical personnel.  Incarcerated individuals are therefore completely dependent on Defendants, BOP guards, and staff to receive essential healthcare.

6.    The BOP and its staff are deliberately indifferent to their obligations and in breach of their duty to provide M.B. with adequate medical care.  USP Lee's provision of healthcare, including mental health care, is systemically dysfunctional and virtually nonexistent for its residents.  As a result, individuals with serious medical and mental health needs are unable to access proper treatment.

7.    This action brought by Plaintiff seeks damages for his individual claims based upon the deliberate indifference and tortious failure of staff at USP Lee to provide him with adequate health care, including mental health care, sufficient to satisfy the minimum standards under the

---

[5] *Statistics*, Fed. Bureau of Prisons,
https://www.bop.gov/about/statistics/population_statistics.jsp;#:~:text=155%2C471%20Total%20Federal%20Inmat
es,Last%20Updated%20February%208%2C%202024 (last visited Sept. 13, 2024).
[6] *See* Program Statement 5310.16; *Psychology Services Manual*, Fed. Bureau of Prisons (Aug. 25, 2016),
https://www.bop.gov/policy/progstat/5310_017.pdf [hereinafter Program Statement 5310.17].

Eighth Amendment of the United States Constitution and as required under Virginia statutory and common law.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because it contains claims that arise under the Constitution and laws of the United States, as well as claims alleging negligent and other wrongful acts by employees of the federal government.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because one or more of Defendants reside in this judicial district, and all or a substantial amount of the events, acts, or omissions giving rise to the individual claims at issue occurred in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

### A.      Plaintiff

10.      Plaintiff M.B. is a 55-year-old man from Anaheim, California who was incarcerated at USP Lee from July 2023 to February 2024, when he was transferred to USP Hazelton.  He is now out of custody.  M.B. suffers from Hepatitis C, severe ulnar nerve damage, and a multitude of mental health issues stemming from several adverse childhood experiences, including, but not limited to, complexities surrounding the death of his father when he was eleven years old, and a sexual assault.  Immediately prior to his incarceration at USP Lee, M.B. was receiving treatment and medications for bipolar disorder, generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder ("PTSD"), and obsessive-compulsive disorder.  Since the 1980s, M.B. has received various therapeutic treatments, at both in-patient and out-patient facilities, and has also received medication to help reduce the symptoms of his diagnosed mental illnesses.

5

### B.    Defendants

11.    Defendant United States of America ("United States") created and oversees the BOP, a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities.  The United States employs all BOP correctional officers, guards, and staff named as Defendants in this action.  At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

12.    Defendant J.C. Streeval ("Defendant Streeval") is the former Warden of USP Lee, and he served as Warden during the entire time M.B. was incarcerated at USP Lee.  He was responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents. He is sued here in his individual capacity.  Upon information and belief, Defendant Streeval resides in Tennessee and worked in the Commonwealth of Virginia.

13.    Defendant Dr. Kareem Wasim ("Defendant Wasim") is the Chief Psychologist of Psychology Services at USP Lee.  Defendant Wasim conducts clinical and forensic psychological evaluations with federal residents. He is sued here in his individual capacity.  Upon information and belief, Defendant Wasim resides and works in the Commonwealth of Virginia.

14.    Defendant Dr. Jose Capriles-Mercado ("Defendant Capriles-Mercado") was a Psychologist within Psychology Services at USP Lee.  He is sued here in his individual capacity. Upon information and belief, Defendant Capriles-Mercado resides in the state of Tennessee and worked in the Commonwealth of Virginia.

15.    Defendant Dr. Bianca Bullock ("Defendant Bullock") is a Psychologist within Psychology Services at USP Lee.  She is sued here in her individual capacity.  Upon information

and belief, Defendant Bullock resides in the state of Tennessee and works in the Commonwealth

of Virginia.

16.    Defendant Dr. Laura Bailey ("Defendant Bailey") is a Psychologist within

Psychology Services at USP Lee.  She is sued here in her individual capacity.  Upon information

and belief, Defendant Bailey resides in the state of Tennessee and works in the Commonwealth of

Virginia.

17.    Defendant Dr. Timothy York ("Defendant York") is a medical doctor within Health

Services at USP Lee. He is sued here in his individual capacity.  Upon information and belief,

Defendant York resides in the state of Tennessee and works in the Commonwealth of Virginia.

## FACTUAL BACKGROUND

**A.    USP Lee and Its Medical and Mental Health Services**

18.    USP Lee is a federal penitentiary within the BOP located in Pennington Gap,

Virginia.

19.    USP Lee is a high-security facility that houses approximately 1,400 adult males.[7]

USP Lee has twelve housing units located in three buildings.[8]  Each housing unit can house 128

residents.[9]

20.    The Heath Services Division at USP Lee is responsible for "deliver[ing] medically

necessary health care to [residents] effectively in accordance with proven standards of care without

compromising public safety concerns inherent to the Bureau's overall mission."[10]  The BOP's own

---

[7] Charles Thornton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council at PIN (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

[8] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/ (last visited Apr. 3, 2024).

[9] *Id.*

[10] *Health Services Administration*, Fed. Bureau of Prisons at 1 (June 26, 2014) https://www.bop.gov/policy/progstat/6010_005.pdf.

core principles recognize that all residents "have value as human beings and deserve medically necessary health care," and residents have a "right to access health care."[11]

21.     The Psychology Services Department at USP Lee is responsible for providing psychological services, which include the "assessment and treatment of mental health disorders as well as evidence-based programs to reduce the risk of recidivism and institution misconduct."[12]

22.     The BOP has created a Care Level Classification System for Medical and Mental Health Conditions or Disabilities for the purported purpose of assigning each resident to an institution that can best meet each individual's care needs.[13]   There are four care levels in the classification system, and an assigned care level is determined by the individual's medical and/or mental health needs based on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as the resident's functional capabilities.[14]

23.     Care Levels 1 and 2 are provisional care levels which are assigned by the Designation and Sentence Computation Center ("DSCC") to newly sentenced residents meeting Care Level 1 or 2 criteria, primarily based on information contained in the resident's presentence investigation report.   Upon a resident's transfer to a new BOP facility, and after an initial or provisional evaluation is performed, a resident's care level can be redesignated to a Care Level 3 or 4 if the resident meets the criteria.[15]

24.     Residents assigned a Care Level 1 may have limited medical needs that can be managed by clinical evaluations every six to twelve months, while residents assigned to Care

---

[11] *Id.* at 2–3.
[12] Program Statement 5310.17 at 1.
[13] *Care Level Classification for Medical and Mental Health Conditions and Disabilities*, Fed. Bureau of Prisons at 1 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf [hereinafter, Care Level Classification Guide].
[14] *Id.*
[15] *Id.*

Level 2 require enhanced medical resources and clinical evaluations anywhere from monthly to every six months.[16]

25.     Residents assigned Care Levels 3 and 4 typically suffer from complex or chronic physical and mental health conditions and require more frequent clinical contacts or enhanced medical services that are only available at a BOP Medical Referral Center in order to maintain stability over their conditions.[17]

26.     In addition to a designated Care Level, residents suffering from a disease or condition that requires monitoring or treatment for greater than twelve months receive chronic care treatment.[18]  Residents whose conditions require intensive clinical evaluations beyond three-to-six months, a limited period of increased frequency of monitoring and/or treatment, are also typically considered chronic.[19]

27.     During a transfer and intake at a new facility, a resident retains the medication that was prescribed by another BOP facility so long as it is not "otherwise restricted by policy (e.g., controlled substance)."[20]

28.     When a resident receives medication through the pill line at their facility, the staff member distributing the medication is required to identify the resident using two forms of identification before administering the dose.[21]  Forms of acceptable identification include a photo ID, date of birth, registration number, or name.[22]

29.     Once appropriately identified, the staff member provides the resident with the medication, ensures they swallow it, and documents the administration in the Medication

---

[16] *Id.* at 2.
[17] *Id.*
[18] *Id.* at 3.
[19] *Id.* at 3–4.
[20] *Id.* at 22.
[21] *Id.* at 18.
[22] *Id.*

Administration Record ("MAR").[23]  If a resident refuses to accept the medication or is deemed a "no-show," that information is required to be reflected in the MAR.[24]

30.    When a facility is on lockdown or when a resident is in the Special Housing Unit ("SHU"), residents are unable to receive medications through the facility's pill line.  In these circumstances, except when a resident is permitted to self-carry their medications, residents rely on BOP staff to deliver medications to them through their cell doors.

31.    USP Lee has one SHU, the purported purpose of which is to (1) house residents in disciplinary segregation as a result of a formal disciplinary finding; (2) house residents in administrative detention pending a transfer or investigation of a disciplinary infraction; and (3) house residents in protective custody.[25]

32.    The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  Instead, guards and staff at USP Lee use that room to abuse and torture residents without justification.  The medical staff tasked with providing adequate care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that take place and the severe injuries to residents that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring obvious or reported wounds and/or by falsifying medical reports.

33.    Although the SHU is generally reserved for individuals who either pose a threat to other residents or staff, or who are at risk of harm, Defendants confine individuals in the SHU for no legitimate reason.  Residents are remanded to the SHU, which is almost always fully occupied, so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation

---

[23] *Id.* at 19.
[24] *Id.*
[25] *Special Housing Units*, Fed. Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf [hereinafter Program Statement 5270.11].

for an individual's complaints regarding the unconstitutional conditions at USP Lee, including the lack of mental healthcare.

**B.      Plaintiff's Mental Health Issues and Claims**

34.      M.B. is a 55-year-old man from Anaheim, California who was formerly incarcerated at USP Lee.  As a child, M.B. endured severe abuse and psychological trauma, including a sexual assault and complexities related to the death of his father during his early adolescence.  These experiences had a direct and negative effect on M.B.'s overall mental health such that he began to experience symptoms consistent with depression at only eleven years old.

35.      Also at the young age of eleven, M.B.'s childhood trauma led him to alcohol and drug use.  M.B.'s drug and alcohol use only exacerbated his mental health struggles.

36.      At thirteen years old, M.B. had his first encounter with the juvenile criminal legal system in Orange, California.  Also at age thirteen, M.B. began to receive treatment for his diagnosed mental health conditions.

37.      At age fifteen, while incarcerated in a juvenile detention center, M.B. attempted suicide on five different occasions, including by slitting his wrist, and was eventually admitted to Camarillo State Hospital, an in-patient psychiatric hospital in California, for one month, to receive treatment for his complex mental health needs.  While in treatment, M.B. received therapeutic interventions as well as medication to manage his psychotic episodes and depression.  M.B. then went to Brea Neuropsychiatric Institute in Brea, California for a time.

38.      Following his discharge from in-patient care, M.B. fell out of compliance with his medication, and again began using drugs to self-medicate.  While M.B. continued to attend out-patient treatment, his drug use persisted.  M.B. spent time in the juvenile and adult correctional systems in California before entering the Utah Department of Corrections in 1995.

11

39.    While in the Utah Department of Corrections, M.B. exhibited symptoms consistent with a mental health disorder.  In 1995, M.B. again attempted suicide on multiple occasions, including by means of ingesting razor blades and consuming a toxic substance.  As a result, he was transferred to the mental health ward at the Utah State Prison where he remained for approximately one month.  Thereafter, in 1996, M.B. was evaluated and diagnosed with manic depression (now known as bipolar disorder).  He again began to receive mental health treatment, including both counseling and medication.

40.    In 2004, while in Utah State Prison at Draper, M.B. was evaluated again and diagnosed with bipolar disorder.  Beginning in 2007, he received further diagnoses of major depressive disorder, recurrent, severe without psychotic features, and antisocial personality disorder, also while at Draper.  With his additional diagnoses, M.B. was prescribed new medications to help treat his symptoms.  These medications included:  Prozac, Seroquel, Bupropion, BuSpar, Wellbutrin, Remeron, Tegretol, Gabapentin, Elavil, and Risperidone.[26]

41.    In 2009, M.B. began his incarceration within the BOP.  After an evaluation by Psychology Services staff at USP Florence, M.B. was diagnosed with obsessive-compulsive disorder, major depressive disorder, and bipolar disorder,[27] and he was assigned a Mental Health Care Level 2.  M.B. also exhibited symptoms consistent with PTSD.  M.B. continued receiving treatment for his illnesses, including both his physical and mental conditions, through various medications, and he maintained this course of treatment at USP Florence from 2009 to 2012.

---

[26] M.B.'s prescribed psychological medications are typically used to treat certain mental and mood disorders and related symptoms, including but not limited to, schizophrenia, bipolar disorder, obsessive compulsive disorder, episodes of mania and/or depression, anxiety disorders, PTSD, and panic attacks.

[27] Per M.B.'s intake screening, his full history of mental health diagnoses includes:  depressive disorder, bipolar disorder, trauma/stressor related disorder, obsessive-compulsive disorder, disruptive/impulse control disorder, major depressive disorder recurrent severe with psychotic features, and antisocial personality disorder.

42.     In 2011, while still at USP Florence, M.B. was sexually assaulted and psychologically manipulated by his then cellmate.  He was sexually assaulted multiple times within a ten-day span, and repeatedly extorted by his cellmate as he continuously "offered" to buy M.B. items from commissary if M.B. complied with his sexual requests.  M.B.'s cellmate would threaten to kill M.B. if he did not play along.  M.B. often contemplated suicide just to put an end to this abuse.

43.     Following these assaults, on September 30, 2011, M.B. was transferred to Federal Correctional Institution ("FCI") Florence, a medium-security facility in Florence, Colorado. While at FCI Florence, M.B. experienced increasingly severe symptoms consistent with PTSD, including feelings of anxiety, fear, and guilt, as well as an increased frequency of nightmares related to his past sexual victimization.  As a result, his treatment plan for his mental health conditions was adjusted, and he was placed on additional medication and received additional treatment to alleviate his symptoms.

44.     While on supervised release in March 2013, M.B. completed an evaluation with Valley Mental Health in Utah.  M.B. reported prior diagnoses of bipolar disorder with depression, PTSD, and obsessive-compulsive disorder.  M.B. was further evaluated by Assessment Referral Services (ARS), and was diagnosed with mood disorder, not otherwise specified, and antisocial personality disorder.

45.     In 2014, while M.B. was at a county jail in Utah, he was prescribed Remeron to treat his mental health conditions.  Later that year, he was transferred from the county jail to Utah State Prison where he continued to receive mental health care, including Remeron, from 2014 to 2020.

13

46.     In 2020, M.B. was returned to federal custody and housed at USP Victorville in Victorville, California.  While at USP Victorville, M.B. was re-diagnosed with generalized anxiety disorder and bipolar disorder, and he was assigned to chronic care for his Hepatitis C diagnosis, nerve damage, and mental illnesses.  M.B. was prescribed Remeron and Wellbutrin to treat his psychological symptoms while at USP Victorville.

47.     In 2022, while at USP Big Sandy in Inez, Kentucky, M.B. continued to receive mental health treatment, including prescribed medications Elavil, Prazosin, and Remeron.  While at USP Big Sandy, M.B. was designated as a Mental Health Care Level 1 because, while medicated, he did not demonstrate any functional impairment associated with a mental health condition and was pleased with the symptom reduction provided by his medications.  M.B. continued his medications throughout his incarceration at USP Big Sandy and his subsequent transfer to USP (now FCI) Atlanta on or about July 2023.

48.     M.B.'s diagnosed psychological illnesses have persisted throughout his adult life, including during his incarceration at various state and BOP facilities.  M.B. has received mental health treatment and medication for his diagnosed illnesses at no less than three BOP facilities, and at least three other state or local correctional facilities.  M.B. received no treatment or medication for his diagnosed illnesses upon his arrival at USP Lee.

49.     When M.B. left USP Big Sandy, he was taking each of Remeron and Elavil once daily.  On or about July 12, 2023, M.B. transferred from USP Atlanta to USP Lee.  He arrived at USP Lee with a 30-day supply of Remeron, and he received his nightly dose of Elavil through the facility's pill line.

50.     On the day of his arrival at USP Lee, M.B. received a Transfer Intake Screening conducted by Defendant Capriles-Mercado, and he was assigned a Mental Health Care Level 1.

14

During the screening, M.B. reported that he felt anxious and expressed interest in receiving psychological treatment at USP Lee. Despite self-reporting anxiety at the time of the screening, Defendant Capriles-Mercado summarized his interaction with M.B. as follows: "Due to the [resident's] unwillingness to disclose mental health symptoms at the time of the assessment, no formal mental health diagnosis will be provided at this time." M.B.'s severe mental health history and his existing symptoms of anxiety were ignored. Instead, Defendant Capriles-Mercado noted M.B.'s reported anxiety but downplayed his concerns as mere nervousness at arriving at a new facility. Accordingly, M.B. did not receive a proper psychological assessment or evaluation upon his arrival at USP Lee.

51. On his arrival at USP Lee, M.B. requested to be placed into protective custody and was placed in the SHU. In a Protective Custody Intake Review report dated July 13, 2023, Defendant Capriles-Mercado claimed M.B. "denied any current mental health concerns . . . [and] did [not] . . . exhibit any symptoms of depression or anxiety." This is not true, as M.B. disclosed his mental health conditions to Defendant Capriles-Mercado on July 12, 2023.

52. Defendant Bullock alleged that, on July 20, 2023, she performed a 30-day SHU review with M.B. She claimed that M.B. denied any concerns regarding his mental health during this meeting. This interaction never occurred and has been falsely reported by USP Lee staff in M.B.'s records.

53. On July 24, 2023, M.B. had a clinical encounter with Defendant York in the medical room in the SHU. Defendant York took M.B.'s vital signs, acknowledged M.B.'s history of sexual assault, and acknowledged that M.B. was taking prescribed mental health medications. Defendant York said nothing to M.B. about discontinuing his medications.

15

54.     Shortly thereafter, without any consultation from Defendant York or any other Health Services or Psychology Services staff, M.B. was discontinued from both Elavil and Remeron.  M.B. was never formally informed of the decision to discontinue his pain and psychological medications.  Approximately two weeks after his July 24, 2023 visit with Defendant York—when his self-carry supply ran out—M.B. submitted a written request for refills of both Elavil and Remeron.  To his surprise, this request was denied.

55.     On August 11, 2023, M.B. was formally diagnosed with PTSD by Defendant Capriles-Mercado, who referred him to Health Services for medication management. However, M.B. was never contacted by Health Services staff, and neither Health Services nor Psychology Services staff took any action to reinstate M.B.'s medications.  Both the referral by Defendant Capriles-Mercado and M.B.'s overall condition were essentially ignored by both departments.

56.     Defendant Wasim alleges that he conducted a second 30-day SHU review interaction with M.B. on August 17, 2023, claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

57.     On September 6, 2023, M.B. submitted a written Informal Resolution Form (BP-8) regarding being taken off his medications.  On September 7, 2023, in response to his grievance, M.B. was informed that he had been discontinued from his medications, including both his mental health medications, Elavil and Remeron, by the clinical director.

58.     On September 11, 2023, M.B. was sexually assaulted by his cellmate.  Following this sexual assault, M.B. submitted multiple written requests to be seen by a physician in Health Services and/or Psychology Services.  Despite his multiple requests, M.B. was not seen or evaluated by anyone in either Health Services or Psychology Services.

59.     Defendant Wasim alleges that he conducted a third 30-day SHU review interaction with M.B. on September 12, 2023, the day immediately following M.B.'s sexual assault by his cellmate.  Defendant Wasim claims that M.B. denied any concerns regarding his mental health. This interaction never actually occurred.

60.     On September 26, 2023, M.B. submitted a written Request for Administrative Remedy (BP-9) to again inquire why he had been discontinued from his mental health and nerve pain medications.  In response, on October 5, 2023, the Warden's office wrote that M.B. transferred to USP Lee on medications "without supporting DSM criteria," and that he had been "discontinued from mental health . . . chronic care clinic."

61.     On or around October 6, 2023, M.B. was seen by Health Services for injuries he sustained from a fall from his bunk bed.  During that encounter, Nancy Smith, a nurse in Health Services at USP Lee, acknowledged that M.B. had raised a question about medication for his PTSD diagnosis, and that he had been referred by Psychology Services for medication.  M.B.'s Elavil prescription was reinstated to address the physical injuries related to his fall and history of nerve damage.  Health Services never reinstated M.B.'s Remeron.

62.     Defendant Bailey alleges that she conducted a fourth 30-day SHU review interaction with M.B. on October 12, 2023, claiming that M.B. again denied any concerns regarding his mental health.  This interaction never actually occurred.

63.     On October 13, 2023, in response to a series of written requests and administrative grievances filed by M.B., M.B. was taken to the Lieutenant's office in the SHU where he was met by a medical secretary and other correctional staff, including Lieutenant Parsons.  During this interaction, and while correctional staff was still present, Defendant Bailey and H. Mullins, a member of Psychology Services at USP Lee, discussed M.B.'s request to speak with someone

17

about his mental health.  H. Mullins gave M.B. a "Feelings" program packet, a section of the "Turning Point" self-help program administered at BOP facilities.  According to the BOP's Psychology Services Manual, "Turning Point is the primary in-cell self-help resource for inmates in restrictive housing . . . .  It is not a treatment program, and instead, is a set of adjunctive materials used as a toolkit for intervening with inmates in restrictive housing."[28]

64.     On October 13, 2023, following the interaction in the Lieutenant's office, M.B. submitted a third administrative grievance (BP-10) requesting reinstatement of his medications and his chronic care treatment status.

65.     Defendant Bailey alleges that a fifth 30-day SHU review interaction occurred with M.B. on November 8, 2023, claiming that M.B. denied any concerns regarding his mental health. This interaction never actually occurred.

66.     Defendant Wasim alleges that a sixth 30-day SHU review interaction was conducted with M.B. on December 7, 2023, claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

67.     On December 14, 2023, Michael Sloan who, upon information and belief, is an assistant in Psychology Services at USP Lee, provided M.B. with the documentation that purports to advise a resident on "Coping," as part of the self-help program "Turning Point."  As noted above, Turning Point is not a vehicle for treating mental health conditions.

68.     Defendant Wasim alleges that on January 4, 2024, he conducted a seventh 30-day SHU review of M.B., claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

---

[28] Program Statement 5310.17 at 21–22.

69.    On January 9, 2024, M.B. participated in a Sexual Abuse Intervention with Defendant Wasim to discuss the sexual assault by his cellmate that occurred on September 11, 2023.  In his notes, Defendant Wasim claims that Psychology Services did not receive any correspondence regarding M.B.'s sexual assault.  Defendant Wasim claims that, during the interview, M.B. did not evidence or share any behavioral indicators of disturbance of mood, no significant appetite or sleep difficulties, or acute psychosis or traumatic response.  As a result, Defendant Wasim reported that no diagnosis was warranted.  Defendant Wasim also claims that he asked M.B. why he had not previously reported the September 11, 2023 sexual assault, and that M.B. allegedly responded that he had not reported it because he did not want to discuss his past sexual victimization with a woman.  Defendant Wasim's account is not true.

70.    On January 11, 2024, Defendant Bailey noted that, despite M.B.'s requests for reinstatement of his Remeron, M.B. did not report any mental health symptoms, nor did he appear to be in any acute distress.  Defendant Bailey advised M.B. that he would need to address his concerns with Health Services staff.  Despite multiple requests to USP Lee administrators and staff, M.B.'s Remeron was not reinstated.

71.    Defendant Wasim alleges that on February 1, 2024, he conducted an eighth 30-day SHU review of M.B., claiming that M.B. denied any concerns regarding his mental health.  This interaction never actually occurred.

72.    M.B.'s Remeron was not reinstated during the remainder of his time at USP Lee. As a result of the abrupt discontinuation from his prescribed mental health medications and failure to reinstate his Remeron, M.B. suffered both physical and emotional injuries due to the lack of health care provided to him at USP Lee.  These injuries have included:  increased fear, worry, panic, anxiety, sweating, tremors, nightmares and disturbed sleep, insomnia, loss of appetite,

weight loss, mood swings, agitation and irritability, headaches, increased feelings of depression, negative self-talk, thoughts of self-harm, and suicidal thinking and behaviors.

73.    On or around February 7, 2024, M.B. was transferred from USP Lee to USP Atlanta. Within days of his arrival at USP Atlanta, psychology staff there conducted a clinical interaction with M.B. Staff at USP Atlanta provided brief supportive counseling; actively listened to M.B., demonstrating empathy to his experiences; provided a psychoeducational handout to reduce anxiety; placed him on the waiting list for First Step Act ("FSA") trauma group; and sent an email to Health Services staff to relay M.B.'s request to have his Remeron reinstated.

74.    On February 22, 2024, M.B. was transferred from USP Atlanta to USP Hazelton in Preston County, West Virginia. He was released from custody on June 7, 2024.

75.    As a result of Defendants' failure to provide adequate health care, including mental health care at USP Lee, M.B. has suffered, and continues to suffer, physical pain and discomfort, and mental anguish and emotional distress, due to Defendants' past, present, and ongoing acts and omissions reflecting their deliberate indifference to his serious mental health problems and medical needs.

**A.    USP Lee's Systemic Failure to Provide Adequate Medical Care Required by the United States Constitution**

76.    Plaintiff incorporates by reference, as though fully restated herein, the allegations set forth in Paragraphs 1–75 above.

77.    The USP Lee staff mantra that they do not provide psychological or mental health care is true. Residents who were prescribed and received medication for mental health conditions prior to their time at USP Lee, including at other BOP facilities, lose access to those medications when they come to USP Lee. Neither Health Services nor Psychological Services at USP Lee conducts adequate examinations of residents for mental health conditions, though they routinely

20

"diagnose" patients as no longer requiring medication.  Residents' medical records are routinely falsified by USP Lee staff to create an incorrect record that further treatment, including medication for diagnosed mental health conditions, is not required.  Requests by residents to speak with Health Services or Psychology Services are ignored.  Indeed, merely asking to see Health Services or Psychology Services can result in a resident being assaulted and tortured by USP Lee staff in retaliation.  The psychological check-ins with residents housed in the SHU required by BOP policy do not occur.  And administrative grievances pleading for mental health care have not yielded any better treatment for USP Lee residents.  In short, the USP Lee staff does not provide adequate mental health care to residents at all.

78.    The experiences reflected by and embodied in Plaintiff's allegations provide only a partial indication of the systemic and pervasive nature of the deficiencies characterizing USP Lee's provision of and/or failure to provide medical care services to residents.  Given the profile of the residents housed at USP Lee—all high-security residents and many with significant mental health conditions—the critical implications of the systemic deficiencies characterizing the provision of medical care at USP Lee are both apparent and disturbing.

**B.     Deviations From the Constitutionally Mandated Standard of Medical Care**

79.    Residents at USP Lee have repeatedly been subjected to situations where USP Lee staff have failed, or refused, to invest the time or effort required to acknowledge, examine, and treat residents with existing and serious mental health and psychological conditions, or symptoms thereof.

80.    Among other failures and as described by Plaintiff, Defendants have:

- Failed to provide Plaintiff with his prescribed medications for this diagnosed mental health conditions;

21

- Failed or refused to acknowledge, examine, diagnose, and treat the serious or potentially serious mental health medical conditions suffered by the Plaintiff in an appropriate and timely manner, in deliberate indifference to serious medical needs;

- Failed or refused in the face of a recognized mental health medical need, to refer Plaintiff for specialized medical care at outside facilities, in deliberate indifference to serious medical needs; and

- Falsified Plaintiff's medical records to justify their failure or refusal to provide mental health care, in deliberate indifference to serious medical needs.

## FIRST CLAIM FOR RELIEF

**(Violation of Plaintiff M.B.'s Eighth Amendment Rights
Against Defendant Streeval, Defendant Wasim, Defendant Bullock, Defendant Bailey,
Defendant Capriles-Mercado, and Defendant York)**

81.     Plaintiff incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–80 above.

82.     The Individual Defendants' deliberate indifference to Plaintiff's serious mental health and psychological needs caused avoidable physical pain and suffering, mental anguish, emotional distress, and the deterioration of his health.

83.     The Eighth Amendment of the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

84.     Defendants' policies, practices, acts, and/or omissions in refusing to provide Plaintiff mental health care despite a clear history and a demonstrated necessity of a medication-

22

assisted treatment regime, the number of Plaintiff's requests to reinstate that regime, and the lack of any medical contra-indications for doing so constitute and reflect deliberate indifference to Plaintiff's serious medical needs and violate the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution. Indeed, Defendant Bailey's, Defendant Bullock's, Defendant Capriles-Mercado's, and Defendant Wasim's repeated falsification of Plaintiff's medical records is reflective of the Individual Defendants' knowledge of Plaintiff's medical needs and their deliberate indifference thereto.

85. The Individual Defendants' policies, practices, acts, and/or omissions placed Plaintiff at an unreasonable risk of suffering new or worsening serious mental health and medical illnesses, injuries, and harm.

86. As a direct, foreseeable, and proximate cause of the Individual Defendants' unconstitutional policies, practices, acts, and/or omissions in regard to the provision of inadequate mental health medical care at USP Lee, Plaintiff has suffered irreparable injury, including physical, psychological, and emotional injury.

87. As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of Defendants' egregious, intentional, and reckless conduct in conscious disregard for Plaintiff's mental health care, as well as their pattern and practice of repeatedly violating Plaintiff's Eighth Amendment rights, Plaintiff is entitled to punitive damages, as well as attorney's fees and all such other appropriate damages and relief permitted by law.

23

## SECOND CLAIM FOR RELIEF

**(Negligence Against Defendant United States of America Pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 1346(b), 2671–80 (1946))**

88.     Plaintiff incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–87 above.

89.     This claim is asserted on behalf of Plaintiff, M.B., against Defendant, the United States of America.

90.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

91.     Under Virginia law a negligence claim is established by:  (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

92.     The Individual Defendants, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate mental health care to Plaintiff given his history of diagnosed mental health disorders was unreasonably dangerous because it placed Plaintiff at risk of physical, mental and emotional injury.

93.     The Individual Defendants, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide, and/or oversee the provision of adequate mental health care to Plaintiff at USP Lee, including, but not limited to, the development, implementation, and supervision of adequate policies and practices for administering mental health care; failing to provide the Plaintiff with his prescribed medications; failing to otherwise treat his diagnosed mental health illnesses; falsifying Plaintiff's

24

records to justify these failures; and ignoring Plaintiff's informal and formal written requests for treatment.

94.     The Individual Defendants, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, negligently and/or carelessly failed to provide adequate medical treatment and/or viable plans for access to mental health services at USP Lee for Plaintiff.

95.     The Individual Defendants knew or should have known that Plaintiff would foreseeably suffer injury as a result of the Individual Defendants' failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

96.     As a direct and proximate result of the negligence and carelessness of the Individual Defendants, Plaintiff has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of the Individual Defendants' acts or omissions, Plaintiff has suffered injuries for which he seeks compensatory and actual damages against the United States.

### THIRD CLAIM FOR RELIEF

**(Medical Malpractice Against Defendant United States of America Pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 1346(b); 2671–80 (1946)**

97.     Plaintiff incorporates by reference as though fully reinstated herein, the allegations set forth in Paragraphs 1–96 above.

98.     This claim is asserted on behalf of Plaintiff, M.B., against Defendant, the United States of America.

99.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

25

100.    Virginia recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

101.    The Individual Defendants, in their capacity and pursuant to their authority and responsibilities as medical providers, officials, employees and/or agents of the United States of America, employees and/or agents, owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

102.    The Individual Defendants, breached their duty of care by failing to ensure that Plaintiff received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his mental health care and treatment when they failed to develop, implement, and supervise adequate policies and practices for administering mental health care; and where, given the knowledge of his mental health history, they failed to provide M.B. with his prescribed medications; failure to otherwise treat his diagnosed mental health illnesses; falsified records justify these failures; and ignored M.B.'s informal and formal requests for treatment.

103.    As a proximate and causal result of these Defendants failure to provide any medical care, Plaintiff has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully prays that this Court:

(a) Award him compensatory and punitive damages in an amount to be determined at trial.

(b) Award the Plaintiff his reasonable attorneys' fees and litigation costs.

(c) Grant all such other and further relief as this Court may deem necessary and/or appropriate in the interests of justice.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims so triable.

Dated:  September 24, 2024

Respectfully submitted,

[Signatures on the following page]
*/s/ W. Hunter Winstead*
**W. Hunter Winstead**
Virginia Bar Number: 66770
Chelsea A. Krzaczek (*pro hac vice
forthcoming*)
December L. Huddleston (*pro hac vice
forthcoming*)
William H. Swain (*pro hac vice forthcoming*)
Attorneys for Plaintiffs
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:  (202) 772-2301
WinsteadH@GilbertLegal.com
KrzaczekC@GilbertLegal.com
HuddlestonD@GilbertLegal.com
SwainW@GilbertLegal.com

*/s/ Kristin L. McGough*
Kristin L. McGough (*pro hac vice
forthcoming*)
Attorney for Plaintiffs
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:  (202) 319-1000
Kristin_McGough@washlaw.org

*Counsel for Plaintiff*

27